# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** <br><br> **v.** <br><br> **AUDREY ANN SOUTHARD-RUMSEY,** <br> **a/k/a Audrey Ann Southard,** <br><br> **Defendant.** | **Case No. 21-cr-387 (APM)** |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. The government requests that this Court sentence Audrey Ann Southard-Rumsey to 72 months' imprisonment (a mid-range sentence within the Guidelines range as calculated by the government), three years' supervised release, $2,000 restitution, and a $700 special assessment.

## I.    INTRODUCTION

Audrey Southard-Rumsey went on a violent rampage through the United States Capitol Building—a rampage that she hoped would lead to the removal of all Democratic officials and the installation of Donald Trump as President for another four years. To carry out her plan, she used her body to attack officers on the East Front, near the House Chamber, and in the Rotunda. And this acclaimed singer used her voice: to urge other members of the crowd to join the attack, to broadcast her plans to take the Capitol, to scream threats at Congress. She got perilously close to her target, much closer than many other rioters that day. Holding a flagpole she turned into a

1

weapon, she led the mob's push to the doors of the House Chamber. Officers who tried to stop her were pinned against doors. Over a year later, they remembered her as one of the principal agitators that day and how, in those moments, they feared for their lives. Meanwhile, members of Congress were in the middle of an evacuation, and some were trapped in the Gallery. They could hear the furious mob outside.

Southard-Rumsey was a known, angry presence at political rallies in Florida during 2020. Leading up to January 6, on Facebook, she began to call for a 1776-style revolution and the execution of traitors if Congress did not certify Donald Trump as the winner of the election. She worked on a manifesto providing the details of the revolution and the new regime she desired. On January 6, she went straight for her target, showing up at the Capitol before President Trump had even begun to speak. She broadcast her intent to take the Capitol on Facebook Live, saying that she just needed enough people to do it. And then, she acted on her plans. She was at the front of the mob to breach the East Front. She was at the front of the mob confronting a small group of officers attempting to keep the crowd away from the Capitol's Rotunda Doors. She screamed at an officer and tried to wrench away his riot shield. It didn't work, and she tried again. The mob eventually got its way, and Southard-Rumsey became one of the first rioters to enter through the Rotunda Doors. Again, she focused on her target, and moved quickly toward the House Chamber. A line of officers came to meet her; the mob filled in behind her. A stand-off began—the stand-off described above that ended with a push led by Southard-Rumsey, now wielding an American flag against officers dedicated to protecting that country.

The House Chamber held despite the mob's advance to the very last set of doors

2

protecting it. But Southard-Rumsey did not give up. She tried to make her way to House Speaker Nancy Pelosi's office, participating in a push against a police line precariously backed up against a set of stairs. She then grabbed the batons of officers who tried to get her to move back. She turned to face the crowd behind her and yelled, "it's now or never! Freedom!" exhorting others to fight, just as she had done near the House Chamber. And then, she saw an opening in the Rotunda crowd, ran toward a heavy metal stanchion, and picked it up with both hands, ready to attack the officers. An officer rushed toward her with his baton, and she backed away.

Outside the Capitol, sitting on the steps, Southard-Rumsey displayed the defiance and remorselessness that has characterized her throughout this case. She lamented that her fellow rioters had not succeeded in breaking into the House Chamber, and angrily yelled that at the crowd they were all going to end up as slaves if they did not fight for their freedom.

The January 6, 2021 attack on the United States Capitol forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1] Southard-Rumsey was one of the most intentional, hostile, and aggressive participants in the riot. Few other January 6 defendants stand convicted of as many assaults, affecting as many officers, and fewer also personally played a leading role in attempting to breach the House Chamber.

---

[1] As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

The government recommends that the Court sentence Southard-Rumsey to 72 months' incarceration for her seven felony convictions—one obstruction conviction under 18 U.S.C. § 1512(c)(2), three assault convictions under 18 U.S.C. § 111(a)(1), and three civil disorder convictions under 18 U.S.C. § 231(a)(3). This represents a midpoint sentence within the advisory Guidelines' range of 63-78 months, a range that includes an upward departure of two offense levels under U.S.S.G. § 3A1.4, cmt. n.4. A 72-month sentence reflects Southard-Rumsey's unapologetic attempt to attack Congress and the acts of violence she committed, and sought to provoke, throughout the Capitol.

## II.  FACTUAL BACKGROUND

### A.  The January 6, 2021 Attack on the Capitol

The government refers the court to the Statement of Facts for Stipulated Trial, ¶¶ 1-9, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.  Southard-Rumsey's Role in the Attack on the Capitol

Local law enforcement officials in Pasco County, Florida became aware of Southard-Rumsey, a voice coach and singer (who reportedly has performed at Carnegie Hall) over the course of 2020 because she was a frequent, aggressive presence, a vocal agitator, at political rallies held in connection with the Black Lives Matter movement and the 2020 presidential election. Southard-Rumsey's conduct at the Florida rallies stayed within the realm of legal, protected activity—for the time being.

4

Following the 2020 election, Southard-Rumsey amplified calls for revolution on social media and worked with a friend on a declaration calling for the abolition of the Democratic Party and institution of a new government. Southard-Rumsey claimed to believe that the election had been stolen and that those who believed otherwise were traitors. In the first week following the election, Southard-Rumsey's Facebook posts included "HANG the TRAITORS!!!" "Arrest and hang these traitors," "go to their work and home pull them out by their teeth and hang them for treason!" She traveled to Washington and was there on November 14, 2020, when a large pro-Trump rally took place. She bragged on Facebook, "Later that night I kicked the crap out of an antifa chick…tore down some blm signs and helped carry the huge Trump flag around."

Southard-Rumsey continued to call for violence on Facebook in December 2020. On December 9–ten days before President Trump would announce plans for a "wild" rally in D.C. on January 6—Southard-Rumsey posted, "We will visit you in mass and remove you from OUR QHITE HOUSE!!"[2] We are about FREEDOM!!! WE WILL NOT QUIT TRUMP or the FIGHT.... get your big girl panties on and stay out of our way!!!" and "locked and loaded."

After December 19—after the announcement of the "wild" rally—Southard-Rumsey's posts continued, and she stated she would be going to Washington. Her posts, however, did not encourage others to participate in a rally or protest. Instead, she encouraged revolution. She had no tolerance for opposing views: either Congress would appoint her preferred candidate, or the people must revolt – in her words, they needed to "go 1776!" on Congress. Those posts—which were deleted at some point—included:

---

[2] "QUITE HOUSE" is likely a Q-Anon reference.

- December 21, 2020: "China Joe cheated, admit it!"
- December 22, 2020: (referring to Congress): "only when they are stripped of their wealth and punished like 1776 will it make a difference!!"
- December 22, 2020: (Discussing COVID relief funds): "Jan 6th go 1776 on these[] mfs."
- December 27, 2020: "Jan 6th Congress does the right thing or We The People go 1776!" and "We The People 1776!!"
- December 28, 2020: "Oh he's gonna end it and the Congressional T r a i t o r s will H a n g[]"; "You MFS 1776 is on its way!"; "Piglosi…we're gonna go 1776 on your a$$"
- December 29, 2020: "Call your Senator's and put the fear of GOD into them...1776!!!" (posted five times); "Jan 6th…1776!"

In posts on January 2 through 4, 2021, Southard-Rumsey continued to call for violence against her opponents. Her posts threatened forceful reprisals and physical resistance against the police. Invocations of "1776" continued.

- "I hope Wed is gonna be a perp walk and ex[e]cution!!"
- "I'm sure my judgment of Piglosi is gonna be okay with God!"
- "Remove them from office by force if necessary!!"
- "T R A I T O R S needs in home/office visit…T R E A S O N needs to be addressed 1776 style!!!"
- "You newbies better do the job we hired you to do…or 1776 will be your fate!!"
- "Going to DC tomorrow…Patriot's vs. Traitors"
- "Use the bicycle cops as a fence and push them up the capital steps and storm the hill!!"

In the meantime, Southard-Rumsey made plans to travel to Washington with three other individuals from the Tampa area, where she lived. In a group chat among the four travelers, one of them ("C.W.") asked for a map, and wondered "Where is City Hall in location to the Capital bldg? Bowser needs to be addressed as well." Another ("R.C."), who planned to wear a Spartan helmet, noted that he would be bringing a pocketknife.

Southard-Rumsey also contributed to a revolutionary manifesto that the fourth member of their group, J.C., had drafted. The manifesto, a proposed 28th Amendment to the Constitution,

6

installed Donald Trump as president through 2024, removed all Democratic politicians and officials, and vested power in a "People's Department Of Government Control And Intervention."[3] The declaration "authorized" the president to direct and order the people's militia to use "all and any force needed to carry out and enforce this declaration." It further authorized citizens to detain and arrest police who might stand in their way: "It is ordered by the People that any Law Enforcement officer acting in contempt of the Constitution is subject to detainment, disarming, and arrest by anyone of the People, the Peoples Militia, national guard or any official active or inactive veteran of the United States Military and or any loyal oath keeping law enforcement officer."

Southard-Rumsey's edits included a suggestion that the manifesto add a line stating "REMOVE TRAITORS NOW!!" Referring to January 6, she also suggested adding "We the People Declare: those who have taken money from other countries to be enemies of the people and are required to resign by 8pm 01/06/21 or be forc[i]bly removed." J.C. responded: "I am thinking of directing the whole thing for this declaration on just removing the democratic party and securing trump and we can take it from there forward on addressing the many other issues." Southard-Rumsey suggested, "We the People declare the election a fraud and those who contributed to it are traitors, and are here by notified of their dismissal from office." Southard-Rumsey shared the declaration on Facebook, explaining "here is what my group is bringing."

---

[3] After January 6, J.C. broadened the declaration to call for the removal of officials from both parties, according to an interview he gave to the *Tampa Bay Times.* "Tampa Bay singer used voice for screaming during Capitol riot." *https://www.tampabay.com/life-culture/2021/01/14/tampa-bay-singer-finds-her-voice-screaming-during-capitol-riot/#:~:text=%E2%80%9CHe%20opened%20his%20eyes%2C%20and,my%20eyes%2C%E2%80%9D%20Christenson%20said.*

### *Southard-Rumsey Arrives at the Capitol Before President Trump Speaks*

On January 5, Southard-Rumsey began the trip from Florida toward Washington D.C. by car with her three fellow travelers. On January 6, they arrived in Washington, D.C. After stopping near the area of President Trump's rally, they went to the Capitol, arriving on the East Plaza. By 11:30 a.m.—before President Trump had even started speaking, let alone called for the crowd to go to the Capitol—Southard-Rumsey was already there. At around noon, she uploaded a photograph of herself at the East Plaza to Facebook and wrote "DC taking it back!!" Four minutes later, she went "live" on Facebook, filming herself at the same location. In the video, she stated: "standing in front of the capitol building, ready to take it. As soon as we get enough people up here. Storm the capitol building, it's gonna be fun." (Ex. 1)



*Figure 1: Declaring her intention to "take" the Capitol at 12:07 p.m.*

As Southard-Rumsey's position in the video indicates, she was at the front of the crowd lining the bicycle-rack barricades along East Front of the Capitol. The Capitol Police stood behind the barricades, guarding the Capitol.

8

At 12:30 p.m., the Joint Session of Congress began. A member of the growing crowd on the East Front used an electronic speaker to broadcast the proceedings as they occurred. When the crowd learned that Vice President Pence was presiding over the Joint Session and not stopping the certification from proceeding, its anger grew.

As she had promised, Southard-Rumsey prepared to respond to those who stood in her way with force. She went live on Facebook again. At 1:19 p.m., she filmed the line of United States Capitol Police (USCP) officers – at that time, fewer than 20 officers—and said, "Standing here at the capitol, ready to take the line. Because Pence is a traitor." (Ex. 2).

At about 1:50 p.m., Southard-Rumsey got into a tug-of-war with another individual who was trying to return a bicycle rack back to the police line, from which it had been removed.



*Figure 2 – Southard-Rumsey (in white hat) struggling to keep barricade away from police line*

*See* *https://archive.org/details/M2yR5wwGJA2sq38mc,* at 9:46:00-9:47:00. Southard-Rumsey pulled so hard she fell to the ground. She was helped back to her feet and yelled that the individual returning the bicycle rack was "fucking Antifa." *Id.*

9

***Breach of East Front and Assault of Officer R.S.***

Soon after, at about 2:00 p.m., hundreds of rioters pushed through the barricades at the East Front and advanced, forcing police to retreat partway up the steps leading to the Rotunda Doors. Having been at the front of the crowd at the barricades, Southard-Rumsey was front and center again as the large crowd confronted the officers, as seen in the images below, from approximately 2:05 p.m.



*Figure 3: Southard-Rumsey in East Front crowd*



*Figure 4: At the front of the crowd, against the police line on steps of the Capitol*



*Figure 5: On the East Front stairs, at the police line*

As seen in the images above, a small number of the officers guarding the steps held riot shields, including Officer R.S. Southard-Rumsey, wearing bright orange gloves, grabbed his shield, as seen below, and tried multiple times to rip it away:



*Figure 7: Grabbing Officer R.S.'s shield (Counts 5-6)*

Consistent with the photographs, Officer R.S. remembered Southard-Rumsey as one of the first and main agitators in the area, screaming at him. It would be a theme that emerged as police later recounted their interactions with Southard-Rumsey.

Testifying in the trial of *United States v. Rhodes,* Officer R.S. recalled, "Everybody, including the people right in front of us, are all starting to do their heave-ho, and basically the whole crowd is just trying to push together to push the line – first line of people against us."

*United States v. Rhodes,* No. 22-cr-15 (APM), Oct. 25, 2022 Trial Tr. (Ex. 3) at 5291. He needed to defend the stairs "[b]ecause if I let them get to the top then, I mean, they would have access to one of the main doors to enter the Capitol." *Id.*

Officer R.S. was hit with flash bang grenades, pepper spray, frozen water bottles, batons, flagpoles that day. He saw rioters who had just attacked the police start singing the national anthem. He saw the Oath Keepers move past him in stack formation, and he bear-hugged an officer in hard-squad gear to keep him from being trampled. Officer R.S. encountered hundreds of rioters that day, *see id.* at 5306, 5309, 5311, 5321, but remembered Southard-Rumsey as, in his words, the "craziest." He still tells the story of their confrontation.

### *Breach of the Capitol Building*

The police line on the steps did not hold. The crowd pushed forward, and USCP officers retreated to the Rotunda Doors, where they were surrounded. Rioters attacked them with sticks, fists, flag poles, and tear gas.



*Figure 8: the struggle at the Rotunda Doors*

13

Rioters tried to break in through the Rotunda Doors, smashing the windows in the process. At approximately 2:25, a rioter inside the building forced open the doors, and the crowd cheered. Rioters rushed through the doors, as others tried to jam a flag through the door to keep it open. Southard-Rumsey, who had again maneuvered her way toward the front of the mob, was one of the first 20 rioters to enter the building through the Rotunda Doors, running through them at 2:26 p.m.



*Figure 9: Immediately after entering the Capitol Building through the Rotunda Doors*

Her three traveling companions had advanced with her up the Capitol steps, but she was the only member of her group who chose to enter the building.

Once inside the building, Southard-Rumsey headed straight for the House Chamber. She walked briskly through the Rotunda and Statuary Hall, shedding articles of clothing as she went, as if she anticipated needing more maneuverability, before arriving in the Statuary Hall Connector, a foyer leading to the House Chamber. She was one of the first to arrive in the area. *See* Ex. 4 ("JaydenX video") at 0:10-0:11.



*Figure 10: One of the first to arrive in the Statuary Hall Connector*

The crowd filled in behind her and she began to gesticulate and yell at officers who had come forward to protect the Chamber and its occupants.



*Figure 11: At the front of the growing crowd at the Statuary Hall Connector; facing the police.*

15



*Figure 12: The growing crowd behind Southard-Rumsey, approximately five minutes later.*

### Assault and Breach of the Statuary Hall Connector Police Line

It was 2:28 p.m. The House of Representatives had gone into recess at 2:18 p.m., then came back into session at 2:26 before recessing again at 2:29, just as Southard-Rumsey and the mob had amassed outside.

Southard-Rumsey again stood front and center against the police line. As captured in the JaydenX video (Ex. 4), Southard-Rumsey screamed at the officers and tried to enlist the crowd to attack and move forward. Ex. 4 at 0:30-6:30.



*Figure 13: Yelling at Congress and the police*

Shortly before, USCP Sergeant N.V. had heard calls for help and rallied a group of officers near the Library of Congress to respond to the Capitol. He directed his officers toward the House Chamber. With his officers behind him, he came forward to meet the crowd before other officers, concerned for his safety, moved up too. The image below shows Sergeant N.V. and Southard-Rumsey.



*Figure 13: Southard-Rumsey and Sergeant N.V.*

Despite being just one member of a large, noisy, angry mob, Southard-Rumsey stood out. Officers remembered her voice, that she was the loudest, that she was riling up the crowd. Officer V.B. explained: "on a scale of 1 to 10, with 10 being the worst, she was a 10 plus." As seen in the JaydenX video, and as stipulated at trial (¶¶ 29-35), Southard-Rumsey screamed at the officers, "Tell Pelosi we're coming for that bitch!" (Ex. 4 at 0:30-0:32) and "Tell fucking Pelosi we're coming for her, fucking traitorous cunt!" (*id.* at 0:32-0:43). She pointed at an employee of the House Sergeant at Arms who stood had come forward and yelled, "fuck you, you little pussy." *Id.* at 1:34-1:37.

She taunted Sergeant N.V., "You ready, you ready?" and then turned around to address the crowd behind her and yelled, "alright, push in here!" Ex. 4 at 1:18-1:24. She asked the other rioters, "you ready to go again?" *Id.* at 1:24-1:26. She turned back toward the police and taunted, "Last breath, last bullet. What's it gonna be?" *Id.* at 1:28-1:31. She then threatened, "there's a hundred thousand of us!" 1:31-1:33. The crowd behind her began to chant, "We want Trump!" *Id.* at 1:46.

Southard-Rumsey turned to face the crowd again and commanded, "Let's go! Move up!" and "we need more people!" *Id.* at 2:05-2:15. By this point, she had picked up an American flag, which she raised in the air. *Id.* Officer M.M. remembered her agitating the crowd, trying to get them "amped up."



*Figure 14: Southard-Rumsey urging the crowd to surge forward; now holding wooden flagpole*

She turned back again to face the police. Another rioter attempted to quiet the crowd. Southard-Rumsey called out, "get out of the way, old man." *Id.* at 2:54-2:56. Multiple officers later told the FBI that Southard-Rumsey rebuffed any effort to de-escalate the situation.

As the crowd continued swelling behind her, Southard-Rumsey pressed the flagpole against Sergeant N.V.'s chest. With her face close to his, she yelled, "you're a traitor to our country! All of them are traitors!" *Id.* at 3:24-3:30. She shouted, "For my son!" *Id.* at 3:42-3:44. After Sergeant N.V. tried to talk to members of the crowd, she responded, "Bullshit!  They are going to feel us!" *Id.* at 3:44-3:48.



*Figure 15: Pressing flagpole against Sergeant N.V. (Counts 7-8)*

Nearly two years later, the memory of Southard-Rumsey holding the flagpole against Sergeant N.V. stuck out in another officer's memory. He remembered worrying that the pole's tip might have been sharpened into a weapon.



*Figure 16: Pressing flagpole against Sergeant N.V. (Counts 7-8)*

The roughly one dozen officers facing the crowd feared the worst: that a violent attack on the House Chamber was imminent. As Officer M.S. recalled, the police were vastly outnumbered

by a crowd of rioters wearing heavy layers of clothes, Kevlar, and carrying Second Amendment flags. He knew that officers on the West Front had been brutally attacked and was concerned that individuals in the crowd had firearms. Officer M.S. described the area as a "bomb waiting to explode," a bomb any one person could set off. Afraid of instigating the crowd, he put away his baton, and hoped that reinforcements would arrive.

Members of the crowd began chanting at the police, "kneel!" Ex. 4 at 4:00. Southard-Rumsey continued to yell at Sergeant N.V., remaining close to him. *Id.* at 4:10-4:18. When another rioter called for calm, Southard-Rumsey again angrily rebuffed those efforts, yelling, "we don't have to be calm!" and then "bullshit!" *Id.* at 4:32-4:35. She turned toward the crowd behind her again and called out, "This is our fucking country! Take it back!" *Id.* at 4:35-4:40. She then turned back toward Sergeant N.V. and the police line and began yelling at the officers again. *Id.* at 4:41-4:48, 5:08-5:25. Another rioter took a bullhorn and told the crowd not to be violent; that "we have to be respectful." *Id.* at 6:11-6:18. Again refusing to de-escalate, Southard-Rumsey shook her head and said, "no." *Id.* at 6:22-6:24. The same rioter said that "we can go in" if "we" are "calm"; Southard-Rumsey's response was, "we own this house." *Id.* at 6:45-7:00.

Her preference for physical force would prevail. At approximately 2:36 p.m., Southard-Rumsey, using the flagpole, and the other rioters surged forward, pushing Sergeant N.V. and other officers back toward the House Chamber. *Id.* at 7:40-7:55. The officers could not restrain the crowd's superior numbers.



*Figure 17: Pushing pole against Sergeant N.V. and police line (Counts 7-8)*

Sergeant N.V. later described the assault to the FBI. Using the flagpole, Southard-Rumsey pushed him into one set of doors, which flung open, and back toward a second set of doors, which led directly to the House Chamber. The crowd pushed behind and alongside her, overpowering the police line. The mob, with Southard-Rumsey front and center, advanced through a vestibule to the main House Chamber doors. House members and staff were still inside the Chamber.

When she pushed him back, Sergeant N.V. was then pinned into the space between the two sets of doors. He hit his head on a marble statue, causing a contusion. Ex. 14 (Sergeant N.V. interview report). Other officers were trapped in the narrow vestibule; some were pinned against the doors. Officer M.M., who had been pinned against a door, remembered telling another officer, "we're not going to die like this," before escaping down the hall. Officer V.B. saw the other officers around him and thought, "this is the last time I'm going to ever see those guys again."

Officer S.V., a Capitol Police "rookie," also got pinned against a door by the mob and feared for his life. He could not escape; he later told the FBI that he felt "immense pressure." He hit his emergency button, trying to alert dispatch that he was trapped. Right next to him, as he was pinned against the door, was Southard-Rumsey. He remembered her trying to smash the door with a flagpole and yelling loudly. At one point, he grabbed her by her shirt and had to push her off of him. She was right in his face, screaming. Her flagpole went right by his head as she swung at the door. Another rioter warned Officer S.V. that he had a knife.

After recalling the crowd's push, and a very vocal, angry Southard-Rumsey in the front of the crowd, Officer D.H. told the FBI, "I've had a lot of sleepless nights." He, too, was pinned against the doors and felt extreme pressure against his body, the crush of the mob. He also recalled that Southard-Rumsey was trying to hit the House Chamber doors, and he tried to catch her hands to stop her. He made a "priority call" (officer needs assistance)—he was face-to-face with screaming rioters and had little room to move.

Fearing for their own safety, Officers D.H. and S.V. extracted themselves from the vestibule area near the Chamber. As they escaped, rioters started yelling, "we're letting them walk!" Recounting his escape to the FBI nearly two years later, Officer D.H. became visibly emotional. He believed that had he used greater force, the situation would only have escalated; the crowd would have responded by becoming even more aggressive. But in that impossible situation, he still could not help wondering, "did I fail?"  "Did I give up?"  Watching video of himself being pushed against the doors, he described Southard-Rumsey as the main agitator of the entire mob. He was still shaken by the memory of her actions that day.

23

Officer V.B., who had also escaped down a hallway, moved to the area of the Speaker's Lobby, where he saw members of Congress, including Representative Adam Schiff, evacuating. Less mobile members were being pushed away in office chairs. Officer V.B. observed that, had the mob turned down the hallway instead of pushing toward the House Chamber doors, they would have run directly into evacuating members of Congress. He was grateful that Sergeant N.V. had bought the members valuable time by trying to talk to the mob and hold it at bay: these minutes may have made the difference between escape and catastrophe.

Meanwhile, the mob remained at the House Chamber doors. On the other side of the doors, officers and members of Congress used furniture to barricade the entrance to the House Chamber. Officer A.M., who helped barricade the doors, described the chaos to the FBI. He had no idea how many people were on the other side of the door. He did not know if they had weapons. The mob was extremely loud.

Rioters shattered the glass in the door leading to the Chamber. Officers inside the Chamber heard the glass breaking and feared that shots had been fired. Some dove to take cover. Inside the Chamber, Officer D.K. yelled for the members of Congress to get down and, for the first time in 19 years of service, drew his gun. He remembers that some staffers and members started to panic, putting on their escape hoods.

Officer J.G. helped barricade the door. Meanwhile, Officer D.K. stared at the main House doors. He saw many people on the other side. He knew he and the other officers were the last line of defense for the members of Congress still trapped inside. It was also clear to Officer J.G. that the "massive" group of rioters on the other side of the door wanted to break down the doors

and bring violence to the floor of the House of Representatives. Officer J.G. knew by this point that "the Senate Chamber had fallen" to rioters but believed that the House Chamber was the last area that was still secure—and it was filled with staff and members who had not yet been able to evacuate. Officer S.W., who also helped barricade the door, could not believe Americans were attacking their own government and believed that, had the rioters made it through the door to the Chamber, they would have harmed the people still waiting to evacuate.

The image below shows the broken glass on the door and the officers protecting the Chamber.



*Figure 18: Officers and a member of Congress at the barricaded House Main Doors*

According to a USCP timeline, at 2:39 p.m., lawmakers began evacuating the Chamber. Those still in the Gallery sheltered in place, as depicted below:[4]

---

[4] Andrew Harnik, Associated Press, *available at https://www.npr.org/sections/pictureshow/2022/01/06/1070610129/photos-one-year-later-a-look-back-on-the-jan-6-insurrection* (last visited March 2, 2022).



*Figure 19: Sheltering in the House Gallery*

Members of Congress who had been trapped in the House Gallery later shared their recollections. [5] "When I looked up, I had this realization that we were trapped," said Representative Jason Crow of Colorado, a former Army Ranger. "I think all of us, myself included, had images of a mass-shooting event," remembered Representative Peter Welch. "It was terrifying in the moment." Representative Val Demings told a colleague, "Just remember, we're on the right side of history. If we all die today, another group will come in and certify those ballots." Some members were later diagnosed with post-traumatic stress disorder. As the Associated Press further described the scene:

> For those still in the gallery, fear was escalating. Crow was tending to Rep. Susan Wild, D-Pa., who was in distress after talking to a family member, while also communicating with [Representative Markwayne] Mullin on the floor below as he helped barricade the door. Rep. Lisa Blunt Rochester, D-Del., was shouting a prayer for peace and healing. [Representative Pramila] Jayapal, who had knee replacement surgery just a few weeks earlier and was using a cane, was trying to figure out how she would escape if she had to run.

---

[5] All material in this paragraph is drawn from Mary Clare Jalonick, Associated Press. "'We were trapped': Trauma of Jan. 6 lingers for lawmakers," *available at https://apnews.com/article/jan-6-capitol-siege-lawmakers-trauma-04e29724aa6017180259385642c1b990.*

She held hands with some of her female colleagues crouching beside her.

In a sentencing hearing for members of the Oath Keepers, Speaker Pelosi's Chief of Staff, Terry McCullough, recalled, "Members and staff prepared for a breach of the House Chamber, uncertain whether they would be tear-gassed or assaulted. A Republican colleague described he felt on the floor a real palpable sense of fear from some members as they donned their gas masks, something they had never had to do before." *United States v. Rhodes,* 22-cr-15 (APM), May 24, 2023 Sent. Tr. (Ex. 5) at 30.

While members of the House evacuated or hunkered down on the gallery floor, not knowing whether they would be able to escape, Southard-Rumsey was at the front of that angry mob that pressed against the doors to the House Chamber.



*Figure 20: At the front of the crowd at the House Main Doors, outside the Chamber*

27

Now just feet away from her goal, within earshot of the Chamber, she yelled, "Pelosi, we're coming for you, socialist cunt, we know where you live!" Ex. 6 (Damon Beckley video) at 0:13-0:17. The screenshot below, from Exhibit 6, is at approximately 2:45 p.m.



*Figure 21: Yelling outside the House Chamber*

For the next several minutes, she continued to yell toward the House Chamber. *Id.* at 3:26, 4:26, 4:36, 4:40, 5:18, 5:36, 5:50, 6:30, 7:15, 7:45, 8:04. Southard-Rumsey did not leave the area until more officers arrived, pushed through the crowd, and removed her and other rioters from the doorway area at approximately 2:52 p.m. Southard-Rumsey's yelling continued as she left the area. *Id.* at 8:18, 8:36.



*Figure 21: Being removed from the House Main Doors by police*

### *Rotunda Assaults*

After police removed her from the main doors to the House Chamber, Southard-Rumsey did not leave the Capitol. Instead, she returned to the Rotunda. At approximately 3:00 p.m., she joined a group of rioters that gathered by an exit from the Rotunda leading toward the offices of Southard-Rumsey's main target that day: Speaker Pelosi.  As at the East Front and near the House Chamber, Southard-Rumsey was at the front of the group, facing the police line. Again, as officers would later recall, she was an aggressor.

Nearby, the staff who worked for Speaker Pelosi hid. Ms. McCullough recalled that "members of the Speaker's staff, my colleagues, my friends, were forced to hide quietly in our conference room for hours until they could be rescued." Ex. 5 (*Rhodes,* May 24, 2023 Sentencing Tr., at 30). "They were subjected to chants and threats and yelling and banging on the door, not knowing whether they would make it out, fearing for their safety simply because they had chosen public service." *Id.* at 31.

A group of Metropolitan Police Department (MPD) officers guarded the exit from the Rotunda, with their backs to a set of stairs. Southard-Rumsey and other rioters began pushing the officers back, where they risked falling down the stairs and sustaining serious injury.



*Figure 22: Pushing against MPD officers guarding a path to Speaker Pelosi's office*

Officers outside the building rushed up the staircase from behind the police line to help.



*Figure 23: MPD officers rushing up the stairs to reinforce officers at the top of the stairs, who were being pushed back*

MPD Officer K.D. remembered a woman matching Southard-Rumsey's appearance using her body weight to push against him and yelling, and he felt in danger of falling backwards down the stairs.



*Figure 24: At the front of the crowd that had pushed police back toward the stairs*

MPD Officer J.G. remembered getting his leg stuck during the push and fearing that rioters were going to encircle the officers. Nearly two years later, he also remembered Southard-Rumsey: she was vocal, she was pushing, and she would not obey officers' commands. Officer J.G. had been on the front lines of protests before, but January 6 was a far more dangerous encounter, and the emotional effects of that day lingered long after it was over.

Once officers called a "1033" (seeking emergency assistance) and reinforcements arrived, they were able to push the rioters, including Southard-Rumsey, back into the Rotunda.



*Figure 25: Southard-Rumsey had to be pushed back to the Rotunda by police*

Officers then began to try to clear rioters from the Rotunda. Again, Southard-Rumsey resisted and sought to incite others around her. She first told the police, "we're not here to hurt you, we don't want to hurt you." But when Sergeant M.H. tried to push Southard-Rumsey back, she grabbed his baton and said words to the effect of, "Get off!" Ex. 7 (Sergeant M.H. body-worn camera) at 1:04-1:08. Sergeant M.H. had to twist his baton to pry it loose from her grasp.



*Figure 26: Grabbing Sergeant M.H.'s baton (Count 1)*

Soon after, Southard-Rumsey pointed at Sergeant M.H. and warned, "you're an asshole.

You're going to get your ass kicked." *Id.* at 1:29-1:32.



*Figure 27: "You're an asshole, and you're going to get your ass kicked." (Count 1)*

She turned away from the officers, faced the rioters behind her and, tilting her head back and projecting her voice, yelled "It's now or never! Freedom!" *Id.* at 1:44-1:49; Ex. 8 (Officer R.D. bodyworn camera) at 1:17-1:21.

She turned back toward the officers. As Officer R.D. pushed her back, she grabbed his baton too (*id.* at 1:30-1:34, and as seen in the following screenshots from Ex. 7 at 1:59-2:01):



*Figure 28: Grabbing Officer R.D.'s baton (Count 1)*



*Figure 29: Grabbing Officer R.D.'s baton (Count 1)*

Another MPD officer, Investigator A.V., then used her hands to push Southard-Rumsey back. Southard-Rumsey grabbed Investigator's A.V. shoulder. Ex. 9 (Capitol security footage) at 0:02-0:05.



*Figure 30: Grabbing Investigator A.V.'s shoulder (Count 1)*

She then appeared to try to hit or elbow Investigator A.V. in the face (*id.* at 0:08-0:10):



*Figure 31: Hitting/elbowing Investigator A.V. in the face area (Count 1)*

Investigator A.V. then pushed Southard-Rumsey back with her hand. Southard-Rumsey tried to charge forward at Investigator A.V., but other rioters stood in her way. *Id.* at 0:12-0:15. Arrows below point to Southard-Rumsey and Investigator A.V., now with some distance between them:



*Figure 32: Southard-Rumsey tried to confront Investigator A.V., but others blocked her path (Count 1)*

Within moments, Southard-Rumsey found a way to retaliate. She moved to an opening in the crowd around a metal stanchion from which, earlier that day, velvet ropes had hung to demarcate paths through the Rotunda. In the image below, an arrow points to Southard-Rumsey starting to move toward the stanchion, which is circled. Ex. 9 at 0:17-0:18.



*Figure 33: Southard-Rumsey looking toward the metal stanchion (Counts 1, 4)*

She bent down and grabbed it with both hands. *Id.* at 0:17-0:19; Ex. 10 (slowed-down

clip from Officer T.C.'s bodyworn camera); Ex. 7 at 2:18-2:20.



*Figure 34: With one hand on the metal stanchion (Counts 1, 4)*



*Figure 35: Two hands on the metal stanchion (Counts 1, 4)*

Observing this, Investigator A.V. later told the FBI, was the "most traumatic" event that happened to her January 6. When interviewed about the incident in October, 2022, FBI agents showed Investigator A.V. a photograph of Southard-Rumsey. She immediately replied, "that's the one who raised the pole up at me." She remembered that Southard-Rumsey's words at the time indicated that she intended to use the metal pole to hurt her. She recalled Southard-Rumsey reaching for her multiple times. She told the FBI that she still dreamed about January 6.

Fortunately, before Southard-Rumsey could attack Investigator A.V. with the pole, MPD Officer T.C. intervened. He also saw Southard-Rumsey grab the pole, yelled "Don't do that!", and rushed toward her. He held out or swung his baton toward her hands, and Southard-Rumsey let go of the pole and backed off. Below is an image from Officer T.C.'s body-worn camera, with his baton visible in foreground, as he moved toward Southard-Rumsey, who held the pole.



*Figure 36: Holding the stanchion and bending down (Counts 1, 4)*

Southard-Rumsey moved back into the crowd and the police continued to clear the Rotunda, directing rioters into the East Foyer, which led to the Rotunda Doors. At 3:17 p.m., approximately seven minutes after her final assault, and about 50 minutes after she had entered the building, Southard-Rumsey left through the Rotunda Doors.

She remained on the steps leading from the Rotunda Doors to the East Plaza. At 3:30, she turned on her camera again and filmed a tearful selfie video. Ex. 11.

She was tearful because her dreams of revolution had not succeeded; she believed that those around her had failed. Speaking through sobs, she said that they had gotten all the way to the doors of the House Chamber, but "the fuckers backed away." Ex. 11 at 0:08-0:17. She said, "I would have broke through the doors, but they would have killed us." *Id.* at 0:39-0:41. She referred to the people around her as "pussies" and said, "you deserve to be a slave if you don't fight for your freedom." *Id.* at 0:50-0:55. She turned the camera around to film a shot of the

39

crowd gathered on the Capitol steps. She then shouted, "all of these people deserve to be slaves if you don't come up these steps and start fighting for your fucking freedom!" *Id.* at 1:00-1:10.

Southard-Rumsey later found the other members of her group, and they left the area before nightfall.

### *Statements After January 6*

After the riot, Southard-Rumsey took to Facebook again. Despite the fact that she herself wielded a flagpole and a stanchion against officers, she wrote, on January 7, "the Patriot's were unarmed!!! Antifa who infiltrated us damaged stuff! We The People we're there for the congress people!" Her warnings to Speaker Pelosi continued the following day: "Hey Pelosi, WE got you! Soon you will be git mod!!" (an apparent reference to United States' detention facility at Guantanamo Bay, Cuba). She also wrote, "Yesterday was glorious!! Im on the Right side of the fence, I love this country and I fought for freedom all the way to the House Doors..literally!!!" She offered her thoughts to J.C., the manifesto author, on "how we get your declaration out."

On January 11, she sent a Facebook message to J.C. describing the riot as "fun": "Just wanted to thank you again for your chivalry on the battle field, I would have never gotten to the doors without you!! . . . I hope we get to have more fun making History in our Country, it has been an honor." The same day, she wrote that she wanted to "see Nancy being arrested damn it."

Southard-Rumsey soon gained increased notoriety. On January 14, the *Tampa Bay Times* published an article about her entitled, "Tampa Bay singer used voice for screaming during Capitol riot."[6] The article's title referred to Southard-Rumsey's accomplishments as a singer;

---

[6] https://www.tampabay.com/life-culture/2021/01/14/tampa-bay-singer-finds-her-voice-

noting that she had won an international vocal competition and performed at Carnegie Hall, and also included images of her at the Capitol. Three days later, the FBI visited Southard-Rumsey at her house.

It appears that Southard-Rumsey appreciated the attention. On January 30, she wrote on Facebook, "I was apart of and made history…thats for ever" and joked, "I'm now a world renound singer…lol I couldn't have ever paid for that exposure." She also wrote in a chat, "im just sooo famous now!"

Her views did not change in the following months. In February 2021, she wrote in a Facebook message, "last bullet or last breath!!" echoing words she had shouted in the Statuary Hall connector on January 6. In March, 2021, she received a message offering support to President Trump. It stated, in part, "true Americans are not deceived, but are fully prepared to fight this evil that sits in places high and low… Be of good cheer Donald. Rejoin us if you can. But know, you did not lose. We elected you. I pray we can resume our fight with you as president as soon as possible." It mentioned "regroup[ing] for a final battle together." She replied, "Love it."

### Arrest and Post-Arrest Statements

On June 2, 2021, the FBI arrested Southard on a complaint arising from her actions at the Capitol on January 6. ECF No. 5. In November 2021, following her superseding indictment, Southard-Rumsey wrote to "Fellow Patriots" on the encrypted application Telegram to try to

---

screaming-during-
capitolriot/#:~:text=%E2%80%9CHe%20opened%20his%20eyes%2C%20and,my%20eyes%2C
%E2%80%9D%20Christenson%20said ("*Singer used voice for screaming*").

raise money. In February 2022, Southard-Rumsey created an online fundraiser on GiveSendGo called the "J6 Patriot Singer Defense Fund." She referred to the prosecution as the "Jan 6th Capital Hill (FBI Entrapment Case)." She said, "I have 11 bogus charges now…I'm willing to go all the way, to defeat Pelosi's Treasonous Cowardly Shit-show." She declared, "I DO NOT APOLOGIZE FOR STANDING UP FOR MY COUNTRY, IT IS MY DUTY AND HONOR." As of June 2023, she had raised $260.

### III.    THE CHARGES AND PLEA AGREEMENT

On October 26, 2022, a federal grand jury returned a second superseding indictment charging Southard-Rumsey with 15 counts, including three violations of 18 U.S.C. § 231(a)(3) (engaging in a civil disorder), five violations of 18 U.S.C. § 111(a)(1) (assaulting, resisting, or impeding officers), and one violation of 18 U.S.C. § 1512(c)(2) (obstructing a proceeding before Congress), in addition to six misdemeanors. ECF No. 38. A jury trial was set for January 19, 2023, but on December 9, 2022, the parties alerted the Court that they had reached an agreement to proceed via bench trial by stipulated facts on seven of the counts instead. ECF No. 43. The Court held the trial on January 27, 2023, at which it accepted the parties' stipulated facts relating to the following offenses:

| Count | 18 U.S.C. § | Charge/Key Conduct |
|---|---|---|
| 1 | 231(a)(3) | Interfering with MPD officers in the Rotunda by grabbing their batons and threatening them, including with a metal stanchion |
| 4 | 111(a)(1) | Threatening MPD officers with metal stanchion in the Rotunda |
| 5 | 231(a)(3) | Obstructing/interfering with Officer R.S. on the steps leading to the Rotunda Doors, including by grabbing his shield |
| 6 | 111(a)(1) | Repeatedly grabbing Officer R.S.'s riot shield on the steps leading to the Rotunda doors |

| 7 | 231(a)(3) | Interfering with Sergeant N.V. in the Statuary Hall Connector |
| 8 | 111(a)(1) | Assaulting Sergeant N.V. with a flagpole in the Statuary Hall Connector |
| 9 | 1512(c)(2) | Obstruction of Congress's certification of the Electoral College vote |

At the stipulated trial, Southard-Rumsey was initially reluctant to concede that the stipulations were accurate, but eventually did. The Court convicted her of all seven felonies.

## IV.   STATUTORY PENALTIES

Southard-Rumsey now faces sentencing on three violations each of 18 U.S.C. §§ 111(a)(1) and 231(a)(3) and one violation of 18 U.S.C. § 1512(c)(2). The government agrees with the following statutory maximum penalties, which were set out in the Presentence Report (PSR):

- Counts 1, 5, 7 (18 U.S.C. § 231(a)(3)):  five years of imprisonment, a term of supervised release of not more than three years, a fine of up to $250,000, and a mandatory special assessment of $100.

- Counts 4, 6, 8 (18 U.S.C. § 111(a)(1)): eight years of imprisonment, a term of supervised release of not more than three years, a fine up to $250,000, and a mandatory special assessment of $100.

- Count 9 (18 U.S.C. § 1512(c)(2)): twenty years of imprisonment, a term of supervised release of not more than three years, a fine of up to $250,000, and a mandatory special assessment of $100.

## V.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). That Guidelines analysis is as follows:

*Count One: Interfering with Law Enforcement Officials During a Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) (interference with MPD officers in the Rotunda at approximately 3:10 p.m.)*

Since there is no applicable Chapter Two Guideline for 18 U.S.C. § 231(a)(3) in the Statutory Appendix, "the most analogous guideline" applies. U.S.S.G. §2X5.1. Here, that is U.S.S.G. §2A2.4, "Obstructing or Impeding Officers."

| Base Offense Level: | 10 | U.S.S.G. §2A2.4(a) |
|---|---|---|
| Cross Reference | 14 | U.S.S.G. §2A2.4(c)(1)—"If the conduct constituted aggravated assault, apply § 2A2.2"<br><br>U.S.S.G. §2A2.2 Aggravated Assault<br><br>Southard-Rumsey's conduct constituted aggravated assault because she assaulted officers in the Rotunda (by grabbing two officers' batons, elbowing or hitting Investigator A.V. in the face, and threatening to attack officers with the metal stanchion) and did so with the intent to commit another felony (assault, under 18 U.S.C. § 111(a)(1) (Count Four) and obstruction, in violation of 18 U.S.C. § 1512(c)(2), Count Nine) *See* U.S.S.G. § 2A2.2, cmt n. 1. |
| Victim-Related Adjustment | +6 | U.S.S.G. §3A1.2 Official Victim<br><br>U.S.S.G. §3A1.2(a), (b): "the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)."<br><br>Southard-Rumsey's assaults in and interference with police officers in the Rotunda between 3:05 and 3:14 p.m. was plainly motivated by their status as such; the officers were in full uniform and acting in their official capacity, doing their job to try to clear the Rotunda.  To Southard-Rumsey, they stood between her and Congress. |
| Total | 20 | |

*Count Four: Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1) (threatening to attack MPD officers with metal stanchion in the Rotunda at approximately 3:10 p.m.)*

The Statutory Appendix lists two guidelines for a Section 111 offense, §2A2.2 (Aggravated Assault) and §2A2.4 (Obstructing or Impeding Officers). The Guidelines direct that if Appendix A specifies more than one guideline, use the "most appropriate" guideline for the offense conduct charged in the count of conviction. *See* §1B1.2 n.1. Here, the most applicable guideline is §2A2.2. Each of Southard-Rumsey's assaults against police officers on January 6 were "aggravated assaults" because they were undertaken with the intent to commit another felony, that is, the civil disorder charged in Count One and the obstruction charged in Count Nine. *See* U.S.S.G. §2A2.2, cmt n. 1.

| Base Offense Level: | 14 | U.S.S.G. §2A2.2(a) |
|---|---|---|
| Victim-Related Adjustment | +6 | U.S.S.G. §3A1.2 Official Victim<br><br>See discussion above for Count One. |
| Total | 20 | |

*Count Five: Interfering with Law Enforcement Official During a Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) (interfering with Officer R.S. on the Capitol steps)*

| Base Offense Level: | 10 | U.S.S.G. §2A2.4(a) |
|---|---|---|
| Cross Reference | 14 | U.S.S.G. §2A2.4(c)(1)—"If the conduct constituted aggravated assault, apply §2A2.2."<br>Southard-Rumsey assaulted Officer R.S. by grabbing his shield, attempting to rip it out of his hands, and pushing him. She committed these acts with the intent to commit another felony, (assault, under 18 U.S.C. § 111(a)(1) (Count Six) and obstruction, in violation of 18 U.S.C. § 1512(c)(2), Count Nine). *See* U.S.S.G. § 2A2.2, cmt n. 1. |
| Victim-Related Adjustment | +6 | U.S.S.G. §3A1.2 Official Victim<br>U.S.S.G. §3A1.2(a), (b): "the victim was a government officer or employee, the offense of conviction was |

| | | |
|---|---|---|
| | | motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)." |
| | | Southard-Rumsey's assault on USCP Officer R.S. was plainly motivated by his official status. He was dressed as an officer. Her objective in this moment was to push through the police line and get to members of Congress. On January 6, prior to her assault on Officer R.S. at the steps of the U.S. Capitol, Southard-Rumsey posted a video to Facebook where she filmed the line of officers guarding the building and stated, "[s]tanding here at the Capitol. Ready to take the line." Days earlier, Southard-Rumsey had also posted to Facebook a command to "Use the bicycle cops as a fence and push them up the capital steps and storm the hill!" |
| Total | 20 | |

*Count Six: Assaulting, Resisting, or Impeding Certain officers, in violation of 18 U.S.C. § 111(a)(1) (assaulting officer R.S. on the Capitol steps)*

| | | |
|---|---|---|
| Base Offense Level: | 14 | U.S.S.G. §2A2.2(a) |
| Victim-Related Adjustment | +6 | U.S.S.G. §3A1.2 Official Victim<br><br>See discussion above regarding this enhancement for Count Five. |
| Total | 20 | |

*Count Seven: Interfering with Law Enforcement Official During a Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) (interfering with Sergeant N.V. in the Statuary Hall Connector at approximately 2:30 p.m.)*

| | | |
|---|---|---|
| Base Offense Level: | 10 | U.S.S.G. §2A2.4(a) |
| Cross Reference | 14 | U.S.S.G. §2A2.4(c)(1)— "If the conduct constituted aggravated assault, apply § 2A2.2"<br><br>U.S.S.G. §2A2.2 Aggravated Assault<br><br>Southard-Rumsey's conduct constituted aggravated assault because she yelled threats at Sergeant N.V. (and the other officers) and then used a flagpole to push back Sergeant N.V. She committed this assault with the intent to commit |

| | | |
|---|---|---|
| | | another felony (assault, under 18 U.S.C. § 111(a)(1) (Count Eight) and obstruction, in violation of 18 U.S.C. § 1512(c)(2), Count Nine)). *See* U.S.S.G. § 2A2.2, cmt n. 1. |
| Victim-Related Adjustment | +6 | U.S.S.G. §3A1.2 Official Victim<br><br>U.S.S.G. §3A1.2(a), (b): "the victim was a government officer or employee, the offense of conviction was motivated by such status, and the applicable Chapter Two guideline is from Chapter Two, Part A (Offenses Against the Person)."<br><br>Southard-Rumsey's assault on USCP Officer N.V. was plainly motivated by his official status. He (and the other officers on the line) were dressed in uniform, and Southard-Rumsey attacked the officers because they were guarding Congress and trying to stop the rioters from advancing. |
| Total | 20 | |

*Count Eight: Assaulting, Resisting, or Impeding Certain officers, in violation of 18 U.S.C. § 111(a)(1) (assaulting Sergeant N.V. with a flagpole in the Statuary Hall Connector at approximately 2:30 p.m.)*

| | | |
|---|---|---|
| Base Offense Level: | 14 | U.S.S.G. §2A2.2(a) |
| Specific Offense Characteristic | +3 | U.S.S.G. §2A2.2(b)(3)(A) Bodily injury<br><br>Sergeant N.V. was pushed into a marble statue and hit his head, sustaining a contusion. |
| Victim-Related Adjustment | +6 | U.S.S.G. §3A1.2 Official Victim<br><br>See discussion above regarding this enhancement for Count Seven. |
| Total | 20 | |

*Count Nine: Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2).*

| | | |
|---|---|---|
| Base offense level: | 14 | U.S.S.G. §2J1.2(a) |
| Special offense characteristic | +8 | U.S.S.G. §2J1.2(b)(1)(B): "the offense involved causing or threatening to cause physical injury to a person, or property damage, in order to obstruct the administration of justice[.]" |

For purposes of this enhancement, the "administration of justice" is synonymous with "official proceeding" as defined in 18 U.S.C. § 1515(a)(1), which in the Capitol riot cases refers to a "proceeding before the Congress, § 1515(a)(1)(B). See below for further explanation.

In her weeks-long quest to prevent Congress from fulfilling its constitutional obligation to certify the 2020 electoral college vote, Southard-Rumsey caused and/or threatened physical injury to numerous police officers tasked with protecting the U.S. Capitol.

She threated to cause physical injury to Officer R.S., the victim in Count Six, by pushing him and trying to wrench away his riot shield while he was on the steps of the U.S. Capitol and attempting to hold back a large group of rioters from storming the building.

Then, in the Statuary Hall Connector, she screamed threats at officers, ("Last breath, last bullet. What's it going to be?"; "there's a hundred thousand of us!") urged rioters behind her to surge forward, and then used a flagpole to push officers back toward the House Chamber, where the certification was supposed to occur—causing several officers to fear for their lives and at least one, Sergeant N.V., to hit his head on a statue. All of those were paradigmatic threats against the officers.

Southard-Rumsey also threatened to cause physical injury to officers in the Rotunda between 3:10 and 3:14, the victims in Counts One and Four. While in the Rotunda, Southard-Rumsey told an officer that he would "get his ass kicked," and attempted to use a metal stanchion against officers trying to clear the Rotunda of rioters.

Moreover, Southard-Rumsey threatened individual members of Congress in her attempt to halt the certification, namely, Speaker Pelosi. In the Statuary Hall Connector just outside the House Chamber, Southard-Rumsey shouted at Sergeant N.V. and the other officers blocking her path, "Tell fucking Pelosi we're coming for her, fucking traitorous cunt!" At around 3:00 p.m., she

|  |  | participated in a push by the rioters at a police line guarding an area that the rioters believed led to Speaker Pelosi's office. See further argument below. |
|---|---|---|
| Special offense characteristic | +3 | U.S.S.G. §2J1.2(b)(2): "the offense resulted in substantial interference with the administration of justice." |
|  |  | For purposes of this enhancement, the "administration of justice" is synonymous with "official proceeding" as defined in 18 U.S.C. § 1515(a)(1), which in the Capitol riot cases refers to a "proceeding before the Congress, § 1515(a)(1)(B). |
|  |  | The official proceeding of Congress's Joint Session, which was required by the Constitution and federal statute, had to be halted for hours while the Vice President and legislators were physically evacuated for their own safety. The mob of which Southard-Rumsey was a part caused at least $2.8 million in damage.  See further argument below. |
| Total | 25 |  |

This calculation is consistent with the calculation in the PSR, with one exception. The PSR's Count Nine offense level calculation includes a six-level official victim enhancement under U.S.S.G. §3A1.2(a)-(b). *See* PSR ¶ 49. Unlike, for example, the assaults reflected in Counts Four, Six, and Eight, however, the crime charged in Count Nine, obstruction of Congress, has no individual victim. The victim of that count is Congress, *i.e.*, the government.

Probation argues that a six-point enhancement applies because "the victim's official status is an element of the offense, and that status is not taken into account under the base offense level," which is 2J1.2. PSR, p. 25. The victim's official status is not an element of a violation of the offense in Count Nine, obstruction of an official proceeding. Moreover, under U.S.S.G. §3A1.2(b), the six-point increase applies only to offenses where the applicable Guideline is from U.S.S.G. §2A, and Count Nine's Guideline is U.S.S.G. §2J1.2.

49

*Under U.S.S.G. §§ 2J1.2(b)(1)(B) and (b)(2), the certification qualifies as the "administration of justice."*

As this Court has ruled, section 2J1.2(b)(1)(B) (causing or threatening injury or property damage to obstruct the administration of justice) applies because the enhancement's reference to "administration of justice" includes Congress's Joint Session on January 6. *See* Ex. 5 (*Rhodes,* 22-cr-15 (APM), May 24, 2023 Sent. Tr). at 168-178; *see also United States v. Wood*, 21-cr-223 (APM), ECF No. 64, Nov. 28, 2022 Sent. Tr. at 35-38 (holding that the "administration of justice" in Section 2J1.2 is synonymous with "official proceeding" as defined in 18 U.S.C. § § 1515(a)(1), including a "proceeding before the Congress"). The government incorporates the Court's reasoning from the *Rhodes* sentencing hearing, and the government's sentencing briefing in *Rhodes,* which similarly argued that obstruction of the Joint Session can qualify as obstruction of or interference with the "administration of justice" for purposes of applying the enhancements under §§ 2J1.2(b)(1)(b) and (b)(2). Gov. Sent. Mem., *Rhodes,* 22-cr-15 (APM), ECF No. 565, at 27-40.   The chart above sets forth the factual basis for concluding that Southard-Rumsey's obstructive conduct involved causing or threatening injury.

The enhancement under Section 2J1.2(b)(2) (substantial interference with administration of justice) also applies. As the Court found in *Rhodes,* interference with the certification can qualify as an interference with the "administration of justice," and the interference caused by the riot on January 6 was "substantial." *Id.* at 178-179, 181. Moreover, as the Court also found, the government need not show that Southard-Rumsey was a but-for cause of the substantial interference that occurred.   *United States v. Rhodes,* 22-cr-15 (APM), May 25, 2022 Sent. Tr. at 3-8 (Ex. 12). It is therefore appropriate to draw the causal line "from all of the participants in the

50

mob, which includes [Southard-Rumsey], that collectively resulted" in the substantial interference, including the halting of the Joint Session for hours and the substantial expenditure of governmental resources. *United States v. Wright,* No. 21-cr-341 (CKK), 2023 WL 2387816, at *12 (D.D.C. Mar. 4, 2023) (citation omitted).

*Grouping analysis*

The government agrees with Probation's grouping analysis. The Section 111(a) and Section 231(a)(3) counts fall into three groups, each containing a 231/111 pair relating to a common victim.

        Group 1: Counts 1, 4 (Rotunda assaults) [7]
        Group 2: Counts 5, 6 (Officer R.S. (East Front) assault)
        Group 3: Counts 7, 8 (Sergeant N.V. (Statuary Hall connector) assault)

Under U.S.S.G. §3D1.2, "closely related counts" group if they "involve the same victim and two or more acts or transactions connected by a common criminal objective," among other criteria for grouping. U.S.S.G. §3D1.2(b). Counts 1 and 4, regarding MPD officers in the Rotunda, Counts 5 and 6, regarding USCP Officer R.S., and Counts 7 and 8 regarding USCP Sergeant N.V., each form a separate group.

That leaves Count 9, the obstruction charge. Under U.S.S.G. §3D1.2(c), convictions group if one count "embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to" another count. Southard-Rumsey's assaultive and threatening conduct in each of the Section 111(a) and Section 231(a)(3) counts embodies conduct that is treated as the specific offense characteristic under §2J1.2(b)(1)(B) for the Count 9

---

[7] Count 1 is slightly broader than Count 4, starting five minutes earlier, but all of the assaultive conduct in Count 4 is encompassed in Count 1.

offense of violating 18 U.S.C. § 1512(c)(2)., When there are "several counts, each of which could be treated as an aggravating factor to another more serious count," "the guideline for the more serious count provides an adjustment for only one occurrence of that factor," and "[i]n such cases, only the count representing the most serious of those factors is to be grouped with the other count." U.S.S.G. §3D1.2, cmt. n.5.

Here, the assault in Count 8 has the highest offense level because it resulted in bodily injury, so it groups with Count 9. Under note 5, the other two groups of assault/civil disorder counts, Counts 1/4 and 5/6, do not group with Count 9. The final grouping, and corresponding units analysis, is:

| Group/Count | Offense Level | Units (USSG § 3D1.4) |
|---|---|---|
| Count Group 1 (Counts 1, 4) (Rotunda) | 20 | 0.5 |
| Count Group 2 (Counts 5, 6) (East Front) | 20 | 0.5 |
| Count Group 3 (Counts 7-9) (Statuary Hall Connector/obstruction) | 25 | 1 |
| Total number of units | | 2 |
| Increase in offense level (§3D1.4) | | +2 |
| Combined offense level | | 27 |

*Chapter 3 Adjustments*

Assuming Southard-Rumsey continues to not dispute the facts to which she stipulated as part of her trial, the government agrees that Southard-Rumsey should receive three points for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and (b). The parties reached agreement on the set of stipulations in this case over a month before trial, and Southard-Rumsey did not contest the essential factual elements of guilt. A three-point reduction brings the offense level to 24.

Finally, the government requests an upward departure under U.S.S.G. §3A1.4, Application Note 4(A) ("Note 4(A)"). Section 3A1.4 allows for an adjustment to the Guidelines range where the defendant's offense of conviction "involved, or was intended to promote, a federal crime of terrorism," as defined by 18 U.S.C. § 2332b(g)(5). U.S.S.G. §3A1.4, cmt. n.1. Where, as here, a defendant's conviction was not for, or was not "intended to promote," an enumerated "federal crime of terrorism," an upward departure is "warranted" if "the offense was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." Note 4(A). When seeking an upward departure, "the government has the burden of proof by a preponderance of the evidence." *United States v. Walls*, 80 F.3d 238, 241 (7th Cir. 1996); *accord United States v. Okane*, 52 F.3d 828, 835 (10th Cir. 1995). The government thus bears the burden to prove that the Note 4(A) adjustment is applicable with reference to Southard-Rumsey's convictions and "relevant conduct." *United States v. Abu Khatallah*, 314 F. Supp. 3d 179, 190 (D.D.C. 2018).[8]

Southard-Rumsey's conduct was calculated for these ends. Before January 6, she collaborated on a manifesto calling for the removal of all Democrats and the installation of President Trump in office and authorizing the use of force to achieve those ends. Linking to the declaration, she wrote, "We will be there with this intention." She characterized those in Congress opposed to President Trump as traitors and called for them to "hang." She urged violent revolt, using the language of fear and intimation, for example: "Call your Senator's and

---

[8] A defendant's "relevant conduct" is the conduct that "occurred during, in preparation for, or to evade responsibility for" the offense of conviction and includes "all harm that resulted from" or "was the object of" the defendant's "acts and omissions," even if uncharged. *Id*. at 187-88 (citing U.S.S.G. § 1B1.3).

put the fear of GOD into them...1776!!!" and "Call your Congress people and tell them there will be no place to hide! 1776." 1776 was her main rallying cry: a reference to violent revolution, a phrase she used to refer to waging war, to taking violent action for political ends, as in "Piglosi...we're gonna go 1776 on your a$$."

Those were not comments Southard-Rumsey uttered for the first time on January 6. Before January 6, Southard-Rumsey's ideology was well developed, and it was an ideology calling for the use of violence and the overthrow of government that would not bend to her will. With buildup culminating in a manifesto and calls for "1776," the Court should conclude that her conduct on January 6 was calculated to serve the ends for which she had advocated in the preceding weeks and months: intimidation of and retaliation against a government that would not install her preferred candidate.

In addition to this evidence of planning and violent intent, Southard-Rumsey's conduct on January 6 further strengthens the basis for the departure. Southard-Rumsey was focused on intimidating Congress that day. She was not there on a whim, someone who followed the crowd after President Trump suggested he was going to the Capitol. She was standing in front of the Capitol before the President's speech even began and, by 12:07, declaring her intention to take the Capitol—an intention she repeated in another Facebook live video an hour later. It is notable that she went to the Capitol without waiting for the rally to conclude or even for President Trump to start speaking. That shows she had a different plan in mind for Washington, a plan focused on Congress and on the Capitol.

Notably, Southard-Rumsey broadcast these videos on Facebook: they were not private

selfies she saved only to her phone. Instead, by going "live" on a social media platform, she sought to recruit others, noting that they would launch the attack "as soon as we get enough people up here." Ex. 1. Indeed, throughout the day, Southard-Rumsey would incite others and provoke violence against the police and the government: by screaming the loudest, by positioning herself front and center of the mob on the East Front, in the Statuary Hall Connector, by the House Chamber, and in the Rotunda, by shouting down those who tried to de-escalate, by yelling calls to action such as, "Push in here!" and "Freedom!  It's now or never!"

Southard-Rumsey's words were not idle threats. She personally and repeatedly assaulted police, grabbing batons and riot shields, leading the mob's push against the police line in the Statuary Hall Connector—an assault that led several officers to fear death—by pushing again in the Rotunda and then, in a moment that haunted her victim long after January 6, by picking up a heavy metal stanchion, poised to attack again. She stood on the front lines and fought officers herself to try to get to members of Congress.

Southard-Rumsey's focus on Congress that day further emphasizes that her conduct was both calculated and intended to influence the government through intimidation or coercion. After being one of the first rioters through the Rotunda Doors, she made a beeline toward the House Chamber. She led the crowd in a push past the police line and all the way to the last set of doors shielding Congress from the rioters, where she continued to yell for Pelosi. Obviously, she believed that members were inside the Chamber. The mob she led caused terror inside the House Chamber as members were trapped in the Gallery, sheltering in place while Capitol Police barricaded the door and, at one moment, several officers ran for cover, fearing the mob had fired

gunshots. Her very next stop, after being removed from the Chamber, was a passage to Speaker Pelosi's office from the Rotunda, where she engaged in a violent push again. After she was finally ejected from the Capitol, she lamented that fear prevented the mob from carrying through on its threat and breaking into the Chamber. In summary, Southard-Rumsey's premeditation, her desire for violent revolution, her focus on seizing control of the Capitol, her efforts to incite violence, the verbal and physical violence she perpetrated across the Capitol, and her attempt to breach the House Chamber, all demonstrate that her actions were "calculated to influence or affect the conduct of government by intimidation or coercion," or to "retaliate against government conduct"—Congress and the Vice President's refusal to stop the certification process or tilt it in President Trump's favor.

This Court found that a departure was warranted in *United States v. Rhodes,* No. 22-cr-15, emphasizing the defendants' agreement to use force (in that case, stockpiling weapons) as well as "the actual use of force by others who went into the building and applied that force against police officers who were doing their duty that day." Ex. 12 (*Rhodes*, No. 22-cr-15 (APM), May 25, 2023 Sent. Tr.) at 78-79. Southard-Rumsey's conduct contains both characteristics: the declaration that she described as her group's ideology described the use of force to overthrow the government; she announced her plan to take the Capitol in a Facebook live video that day, after calling for violent revolution on social media; and she personally engaged in widespread violence at the Capitol. Indeed, she engaged in a more violent attacks against police than any of the Oath Keeper defendants in the *Rhodes* case.-

Southard-Rumsey's case is also distinguishable from *United States v. Gardner,* where this Court declined to apply the enhancement primarily because no other judge had yet done so, and because the eight-level enhancement to the obstruction offense already reflected the seriousness of the conduct in that case. [9] *Gardner,* 21-cr-622 (APM), ECF No. 63, Mar. 16, 2023 Sent. Tr. at 56. Neither reason should prevent the Court from finding that Southard-Rumsey's conduct meets the standard for the the Note 4(A) departure. First, this Court has now departed under Note Four in the January 6 context. *See, e.g.,* Ex. 12 (*Rhodes,* 22-cr-15 (APM), May 25, 2023 Sent. Tr. at 79 (imposing six-level upward departure)). Second, Southard-Rumsey's conduct was far worse than that of the vast majority of January 6 defendants convicted of similar crimes in at least three respects: the level of premeditation and demonstrated intent to overthrow the government; the breadth of the assaultive behavior; and her efforts to lead and incite the crowd. Moreover, her role as a leader of the push at the entrance to the House Chamber also meant that her assault threatened many more people that Sergeant N.V. or even the other officers on the police line—the violence committed on Officer N.V. is enough to justify the +8 enhancement for the obstruction offense, but Southard-Rumsey terrorized the House members and staffers who were trapped inside the House Chamber on January 6—not to mention the many other officers she personally attacked or incited others against that day. An upward departure is appropriate to capture the full range of victims of Southard-Rumsey's attacks. Her planning, her effort to assume leadership of the mob, and her deliberate and persistent violence,

---

[9] The government acknowledges that Judge Friedrich in *United States v. Reffitt,* No. 21-cr-32, Judge Kollar-Kotelly in *United States v. Wright,* No. 21-cr-341, and Judge McFadden, originally in *United States v. Judd,* 21-cr-40 (TNM), have also declined to apply Note 4(a) enhancements.

among other factors, set Southard-Rumsey apart from many others charged with obstruction and warrant the departure here.

The government seeks only a modest, two-level departure under Note 4 here. That would bring the total offense level to 26, resulting in a Guidelines range of 63-78 months.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

On balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

Southard-Rumsey's conduct was egregious both in absolute terms and relative to nearly any other January 6 defendant. As described in detail in this memorandum, her premediated, violence, and treasonous conduct on January 6, 2021 helped fuel a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of presidential power, and throwing the United States into a Constitutional crisis. That is exactly what Southard-Rumsey had in mind: if Congress refused to certify Trump, she called for others to go "1776" on them, to treat them like traitors deserving of execution, to execute the plan called for in J.C.'s manifesto. And, on January 6, that is exactly what she tried to do, assaulting officers throughout the Capitol and inciting others to do the same. The nature and circumstances of Southard-Rumsey's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 72 months' imprisonment.

### B.   The History and Characteristics of the Defendant

The *Tampa Bay Times* profile suggests that Southard-Rumsey's radicalization began during President Obama's term in office and the Tea Party movement, when she began spreading

birtherism on Facebook and became active in the Tea Party movement. Southard-Rumsey's GiveSendGo fundraiser also described her history of political activism as stretching back to 2008/2009 "protests against Obama's Policy's and commie's."

By 2020, although she had never been arrested, she was known to local law enforcement officials as an agitator at local political events. Two individuals who had encountered her at previous protest, and who were interviewed for the January 2021 *Tampa Bay Times* article about Southard-Rumsey, shared that assessment. M.W., a former friend of Southard-Rumsey's, was marching with a Black Lives Matter group in the summer of 2020 when Southard-Rumsey pulled up in her car and got out, screaming, "telling us to get jobs, get off welfare, back the blue." *Singer used voice for screaming.* An organizer of Black Lives Matter demonstrations in Pasco County recognized Southard-Rumsey in the JaydenX video: "When someone screams at you that much, trying to get you to fight them, for an entire summer…it's engraved in my mind." *Id.* Southard-Rumsey, though, apparently knew how to toe the line at a protest and keep her actions non-violent and legal—although perhaps not entirely: she had also bragged about beating up an "antifa chick" when she protested the election in D.C. in November 2020.  In any event, she cannot blame her total lack of judgment on January 6 on immaturity or on naivete about political demonstrations. Despite her experience, she chose to flout the law on January 6.

And she was proud of it. Southard-Rumsey has been remorseless and defiant ever since January 6. She has referred to the proceedings as "Pelosi's treasonous cowardly shit-show." She has not done so much as apologize to a single one of the officers she attacked that day. In all capital letters, her online fundraiser declares the opposite: "I DO NOT APOLOGIZE." She has

not taken down her GiveSendGo fundraiser refusing to apologize and referring to the charges as bogus. The Court may recall that, at the stipulated trial, immediately after the Court convicted Southard-Rumsey of seven felonies, she sought permission to attend a January 6-themed gathering at the DC-jail. Her desire to immediately associate with others who stormed the Capitol and protest these cases is another indicator that she regrets none of her criminal conduct.

### C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Southard-Rumsey's criminal conduct on January 6 was the epitome of disrespect for the law. In fact, on January 6, she hoped to overthrow our system of government, remove all members of one political party from office, and install Trump in office for four more years.

### D.     The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate de]terrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[10] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol. As this Court has found, "We simply cannot have a country in which when people are on the losing side of an election, you think you can use violence and physical force to undo that result." *United States v. Webster,* No. 21-cr-208 (APM), ECF No. 124, Sept. 22, 2022 Sent. Tr. at 62.

---

[10] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

### *Specific Deterrence*

There is an overwhelming need for specific deterrence here. As described above, Southard-Rumsey has been remorseless. She had the strength, stamina, and violent proclivity to engage in hand-to-hand combat with several armed police officers. Before January 6, she was seen as a potential threat and had bragged about destroying property and beating up another person at a political rally. And as long as she proclaims that she is proud of what she did on January 6, the Court should be concerned that she will resort to violence in her future political activities, and that she will continue to try to incite others.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.     Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord* United States v. Sanchez, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).

"[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[11]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[12]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, no previously sentenced case contains the same balance of aggravating and mitigating factors present here: a defendant with no criminal history who planned to revolt on January 6 and essentially went on an assaultive rampage throughout the building. In certain

---

[11] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[12] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

respects, however, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

This Court sentenced Thomas Webster, 21-cr-208 (APM), to ten years in prison, four more years than the government seeks in this case. Webster, like Southard-Rumsey, had no criminal history, and committed the crime of assault on January 6. Gov. Sent. Mem., *United States v. Webster,* 21-cr-208 (APM), ECF No. 104 at 33 (D.D.C. filed Aug. 24, 2022). Certain facts of his case are indisputably more aggravating: Webster tackled and pinned his victim on the ground and tried to rip off his gas mask. *Id.* at 22-23. Where Southard-Rumsey picked up and then dropped a stanchion, Webster followed through, swinging a metal flagpole at the officers, and was convicted of violating 18 U.S.C. § 111(b). *Id.* at 20-21. He also testified at trial in ways that were not credible. *Id.* at 25, 38.

Webster, however, had spent approximately 25 years serving the public before his conviction. *Id.* at 33. And his single count of assault had one officer victim. Southard-Rumsey attacked officers both outside and inside the Capitol, officers who vividly remembered her almost two years later. Webster also was not convicted of obstruction of Congress. Southard-Rumsey was, and her early arrival and focus on "taking" the Capitol and her role leading the crowd that threatened to break into the House Chamber are one of the most egregious examples of that crime.

Another rioter in the crowd by the Statuary Hall connector, Christopher Grider, was sentenced to 87 months' imprisonment after being convicted in a (non-stipulated) bench trial. *United States v. Grider,* 21-cr-222 (CKK). Grider marched to the Capitol after President Trump's

speech. Gov. Sent. Mem., *Grider,* 21-cr-222 (CKK), ECF No. 170, at 4 (D.D.C. filed Apr. 14, 2023). He entered the Capitol through the Senate Wing Door soon after the initial breach, saw an exposed circuit-breaker box and tried unsuccessfully to turn off the power, saw other rioters scuffle with officers in the Crypt, and, three rows behind Southard-Rumsey in the Statuary Hall Connector, also motioned for rioters to join her push. *Id.* at 8-13. He yelled "stop the steal!" He was well back of Southard-Rumsey in the group at the House Chamber Doors, where he held up a helmet. *Id.* at 12-13.



*Figure 37: Grider holding up his helmet (circled) near House Main Doors, well behind Southard-Rumsey*

Grider next went to the Speaker's Lobby, where he handed his helmet to another rioter, who used it to break the glass; Grider also tried to open the door in the area. Id. at 16-18. He pled guilty to two misdemeanor charges, was convicted at trial of one count each of 18 U.S.C. §§ 231(a)(3), 1361, and 1512(c)(2), as well as four additional misdemeanors. Id. at 18-19. He took the stand in his own defense and testified falsely regarding his mental state. Id. at 20.

Southard-Rumsey's conduct was worse than Grider's in almost every way. Where he was in the middle of the pack, she was front and center. Grider tried to switch off the power and gave his helmet to another rioter who used to it damage a window; Southard-Rumsey personally assaulted multiple officers. Grider traveled to the Capitol only after the president's speech; Southard-Rumsey needed no instruction that morning, but was already there, announcing her intent to take it. Had Grider not contested his guilt at trial and given false testimony, Southard-Rumsey would almost certainly be deserving of a markedly longer sentence.

The government is aware that the Court recently sentenced Markus Maly to 72 months' imprisonment—the same sentence requested here—and that Maly was Criminal History V. *United States v. Maly,* 21-cr-178 (APM). Other January 6 defendants with less substantially less criminal history, however, have received longer sentences. *See, e.g., United States v. Christopher Grider,* No. 21-cr-22 (CKK) (no assault conviction, no criminal history, 83-month sentence); *United States v. Thomas Robertson,* 21-cr-34 (CRC) (no assault conviction, no criminal history, 87-month sentence). The Court, however, concluded that Maly's criminal history had been overstated, observing that most of his criminal convictions were old and were committed when Maly was abusing controlled substances, and that seven of the eleven points that did count were for two convictions that barely fell within the 15-year window. *United States v. Maly,* 21-cr-178 (APM), June 9, 2023 Sent. Tr. (Ex. 13) at 54-56.

Maly's conduct, while involving a dangerous weapon, is nonetheless distinguishable from Southard-Rumsey's in certain respsects. The Court noted that Maly made a last-minute decision to travel to D.C., was not among the front of the crowd during the police line collapse

66

on the West Front, briefly sprayed an officer with a chemical irritant, later passed a canister of irritant to another rioter, and was among the mass of people in the Lower West Terrace Tunnel. *Id.* at 49, 59. Southard-Rumsey's decision to go to Washington and her objectives there—to prevail in the certification or incite a revolution—were far more calculated, befitting her obstruction conviction (Maly was not charged with obstruction). Southard-Rumsey's assaultive conduct was more prolonged and extensive. And again, she led the crowd to the doors of the House Chamber, placing several officers in a life-threatening situation as a result. It would not create an unwarranted disparity to impose a sentence equal to Maly's here.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims

has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted).

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[13]

---

[13] Both statutes permit the sentencing court to decline to impose restitution where doing so

Because this case involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A) (requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses, 18 U.S.C. § 3664(h). That latter approach is appropriate here.

More specifically, the Court should require Southard-Rumsey to pay $2,000 in restitution for her convictions. This amount fairly reflects Southard-Rumsey's role in the offense and the damages resulting from her conduct. Moreover, in felony cases where the parties have entered into a guilty plea agreement, $2,000 has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

In *United States v. Rhodes,* 22-cr-15 (APM), this Court ordered further briefing from the government on the issue of causation and restitution. The government incorporates the arguments from the filing that to be submitted in that case on July 7.

---

will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

## VIII. CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 72 months' imprisonment, three years' supervised release, $2,000 restitution, and a $700 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:   */s/ Alexis J. Loeb*
      ALEXIS J. LOEB
      CA Bar No. 2696895
      DAVID J. PERRI
      WV Bar No. 9219
      Assistant United States Attorneys (Detailed)
      ALEXANDER DIAMOND
      NY Bar No. 5684634
      Assistant United States Attorney
      601 D Street NW
      Washington, DC 20001
      Office: (415) 436-7168
      Alexis.Loeb@usdoj.gov